# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| CYNTHIA M. MOLINARO, | : | Case No. 1:23-cv-402 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| TRIHEALTH HOSPITAL, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## ORDER AND OPINION

---

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 25). Plaintiff filed a Response in Opposition (Doc. 26), to which Defendants filed a Reply in Support (Doc. 29). For the following reasons, Defendants' Motion for Summary Judgment (Doc. 25) is **GRANTED**.

## FACTS

### I.     Plaintiff's Employment

Plaintiff Cynthia Molinaro was born in 1955. (Molinaro Dep., Doc. 22, Pg. ID 846.) Beginning in 1999, Plaintiff worked as a Staff Registered Nurse ("Staff RN") for Defendants TriHealth, Inc. and TriHealth Hospital, Inc. (collectively, "TriHealth"). (*Id.* at Pg. ID 852-57.) She worked at TriHealth's Bethesda-Butler Hospital from 2018 until her separation. (*Id.* at Pg. ID 853-55.) The position of a Staff RN is a physically demanding job and can include frequent bending, pushing, and reaching, as well as consistent lifting of

objects over thirty-five pounds. (*Id.* at Pg. ID 864-65, 1033-34.) TriHealth's job description requires that employees in this position be able to consistently lift up to fifty pounds. (*Id.* at Pg. ID 866-67; *see also* Job Description, Doc. 22-2, Pg. ID 1140.)

From 2019 to 2022, Plaintiff reported to Nurse Manager Kathy Lebowitz; then, in 2022, Rebecca Schmidt replaced Lebowitz. (Molinaro Dep., Doc. 22, Pg. ID 855-56; Schmidt Dep., Doc. 18, Pg. ID 408; Lebowitz Dep., Doc. 21, Pg. ID 743.) Plaintiff received positive performance reviews while she was supervised by Lebowitz. (Molinaro Dep., Doc. 22, Pg. ID 859-861; *see also* Performance Reviews, Doc. 22-1, Pg. ID 1114, 1125, 1135.) Plaintiff reported no issues with Lebowitz during her employment. (Molinaro Dep., Doc. 22, Pg. ID 861.)

## II.     TriHealth's Workplace Policies

TriHealth maintains an Equal Employment Opportunity/Non-Discrimination policy, and a Corporate Compliance: Duty to Report and Non-Retaliation policy, which seeks to promote a culture that prevents violations of law and provides an Alertline phone number so that employees can anonymously report violations of law. (Molinaro Dep., Doc. 22, Pg. ID 870-72.) Plaintiff was aware of these policies during her employment; however, Plaintiff never utilized the Alertline. (*Id.* at Pg. ID 870, 872.) Additionally, TriHealth has an American with Disabilities Act ("ADA") policy, which states that, when possible, TriHealth will provide a reasonable accommodation to employees in their current position, or an alternative position for which they are qualified if they cannot be reasonably accommodated. (*Id.* at Pg. ID 877-78; ADA Policy, Doc. 22-5, Pg. ID 1156-57.) Under this policy, if an employee's restrictions cannot be reasonably

2

accommodated, the employee will be placed on a leave of absence for up to sixty days while the employee and TriHealth seek to locate a job the employee can perform. (Molinaro Dep., Doc. 22, Pg. ID 878; ADA Policy, Doc. 22-5, Pg. ID 1156-57.)

TriHealth also provides a Modified Duty Program for employees with an injury or illness, which offers a temporary work placement to minimize the impact of an employee's disability. (Molinaro Dep., Doc. 22, Pg. ID 876-77.) Under this program, employees are given less physically demanding work for a period of ninety days; extensions may be granted if the employee anticipates returning to work during that extension. (*Id.* at Pg. ID 880-82.) If a modified duty is unavailable, TriHealth places the employee on a leave of absence. (*Id.*) TriHealth's Leave of Absence ("LOA") policy addresses several types of leave, including administrative leave, Family and Medical Leave Act ("FMLA") leave, and non-FMLA leave. (LOA Policy, Doc. 22-7, Pg. ID 1167-68, 1170, 1175-76.) Under the policy, administrative leave provides employees who are returning to a position that is no longer available ninety days to seek a new position. (*Id.* at Pg. ID 1165, 1167-70.) Meanwhile, FMLA leave is job-protected under the LOA policy, meaning that an employee's position will be held until they return. (*Id.* at Pg. ID 1170-75.) Non-FMLA leave, however, is not job-protected. (*Id.* at Pg. ID 1175.) Under the LOA policy, no combinations of leave may exceed 275 consecutive days. (*Id.* at Pg. ID 1168; Molinaro Dep., Doc. 22, Pg. ID 888.) Plaintiff was aware of this LOA policy during her employment. (Molinaro Dep., Doc. 22, Pg. ID 886.)

### III.    Plaintiff's Injury

On June 3, 2021, Plaintiff suffered a workplace injury after slipping on water that had overflowed from an ice machine. (Molinaro Dep., Doc. 22, Pg. ID 889.) Four days later, Plaintiff reported the workplace injury and visited TriHealth's Occupational Medicine Department for treatment. (*Id.* at Pg. ID 892.) During that visit, Plaintiff reported injuries to her neck, left shoulder, right wrist and thumb, and right hip. (*Id.* at Pg. ID 892.) Plaintiff was diagnosed with sprains in the following locations: ligaments of cervical spine, ligaments of thoracic spine, parts of lumbar spine and pelvis, radiocarpal joint of right wrist, and left rotator cuff capsule. (*Id.* at Pg. ID 894-95, 899-900; Medical Notes, Doc. 22-10, Pg. ID 1192-93.)

The same day as Plaintiff's diagnosis, TriHealth's Workers' Compensation Case Manager Monika Heid notified Plaintiff that a workers' compensation claim had been opened for her June 3rd injury. (Molinaro Dep., Doc. 22, Pg. ID 898; Workers' Compensation Letter, Doc. 22-11.) Plaintiff also received notice that TriHealth's third-party administrator, Sedgwick, would be handling her workers' compensation claim. (Molinaro Dep., Doc. 22, Pg. ID 898; Workers' Compensation Letter, Doc. 22-11.) On June 17, 2021, Sedgwick approved Plaintiff's request for workers' compensation reimbursement for twelve sessions of physical therapy. (Molinaro Dep., Doc. 22, Pg. ID 900-01; Reimbursement Form, Doc. 22-12.) On June 21, 2021, Plaintiff had a follow-up appointment at TriHealth's Occupational Medicine Center, and Physician Assistant Lilian Sedacca completed a workers' compensation form known as a "Physicians Report of Work Ability" (also known as MEDCO-14). (*Id.* at Pg. ID 901-02.) The MEDCO-14 did

4

not provide any medical restrictions for Plaintiff. (Molinaro Dep., Doc. 22, Pg. ID 902-03; MEDCO-14, Doc. 22-13.) At this point, Plaintiff continued to perform her job without restrictions. (Molinaro Dep., Doc. 22, Pg. ID 903.)

On July 15, 2021, Plaintiff again slipped on water from an ice machine at work, re-injuring herself. (Molinaro Dep., Doc. 22, Pg. ID 904.) Plaintiff reported this injury the next day and visited TriHealth's Occupational Medicine Department, where Physician Assistant Deborah Wiater ("PA Wiater") treated her. (*Id.* at Pg. ID 905-06.) PA Wiater completed a MEDCO-14 at that visit, which referenced only Plaintiff's original June 3rd injury and indicated that Plaintiff was unable to return to work full duty until July 23, 2021, because she had reinjured her shoulder and back. (*Id.* at Pg. ID 909-11; Second MEDCO-14, Doc. 22-15.) PA Wiater submitted a request for workers' compensation to cover Plaintiff's MRI under her June 3rd injury; Sedgwick approved this claim on July 22, 2021. (Molinaro Dep., Doc. 22, Pg. ID 913.) Meanwhile, on July 16, 2021, TriHealth provided Plaintiff with a Modified Duty Agreement because of Plaintiff's medical restriction to use left arm as tolerated. (*Id.* at Pg. ID 914-15.) The agreement stated that Plaintiff would continue working full duty but would notify the Charge Nurse if there was something she could not do. (Modified Duty Agreement, Doc. 22-16, Pg. ID 1223.)

Then, during another medical visit on July 23, 2021, PA Wiater completed a "First Report of Injury" form and MEDCO-14 for Plaintiff's July 15th injury, as well as another MEDCO-14 for Plaintiff's June 3rd injury. (Molinaro Dep., Doc. 22, Pg. ID 916-18, 921; July 23 Visit Notes, Doc. 22-17.) The First Report of Injury form listed Plaintiff's diagnosis as sprains of ligaments of cervical spine and sprain of left rotator cuff capsule. (Molinaro

Dep., Doc. 22, Pg. ID 918; July 23 Visit Notes, Doc. 22-17.) The MEDCO-14 for Plaintiff's June 3 and June 15 injuries placed medical restrictions through August 2, 2021, which restricted Plaintiff from reaching above the shoulder, pushing, pulling, lifting or carrying more than ten pounds, and using her left arm. (Molinaro Dep., Doc. 22, Pg. ID 920-21; July 23 Visit Notes, Doc. 22-17.) Prior to this appointment, though, Plaintiff had to lift patients, which had aggravated her neck and shoulder. (Molinaro Dep., Doc. 22, Pg. ID 923; July 23 Visit Notes, Doc. 22-17.) Plaintiff also submitted a new workers' compensation claim for the June 15 injury; however, Sedgwick did not validate this claim. (Molinaro Dep., Doc. 22, Pg. ID 934-35.)

On July 27, 2021, Heid, TriHealth's Workers' Compensation Case Manager, informed Plaintiff that TriHealth could not accommodate her restrictions in her current role and was looking for an alternate position. (Molinaro Dep., Doc. 22, Pg. ID 923-25.) Plaintiff requested leave in response. (*Id.*) TriHealth countered by allowing Plaintiff to enter into an amended Modified Duty Agreement, which provided that Plaintiff would perform rounds on patients and office-type work. (*Id.* at Pg. ID 927; *see also* Amended Modified Duty Agreement, Doc. 22-20.) While Plaintiff initially performed desk work under this amended agreement, she eventually transitioned to the position of Triage Nurse, which involves pushing patients in wheelchairs, assisting them with walking, and taking their blood pressure. (Molinaro Dep., Doc. 22, Pg. ID 933, 862, 1041.)

During this time, Plaintiff's several workers' compensation claims caused confusion regarding her restrictions and reimbursement requests. (Molinaro Dep., Doc. 22, Pg. ID 941-42.) Because Sedgwick had rejected her June 15 injury claim, subsequent

6

requests related to that injury were denied. (*Id.* at Pg. ID 937-39.) To resolve this issue, TriHealth consolidated Plaintiff's claims with the allowed conditions of cervical sprain, thoracic sprain, lumbar sprain, left shoulder sprain, and right wrist sprain. (*Id.* at Pg. ID 943-44.) Thus, Sedgwick finally approved Plaintiff's request for reimbursement of her orthopedics referral, massage therapy, and additional physical therapy. (*Id.* at Pg. ID 946.)

Plaintiff's workers' compensation attorney filed a motion with the Ohio Bureau of Workers' Compensation ("Ohio BWC") to include additional injuries on her claim based on findings from her MRI; however, this motion did not request inclusion of biceps tendinosis, which had also appeared on the MRI. (Molinaro Dep., Doc. 22, Pg. ID 944-45, 949-50.) Through September and October 2021, Plaintiff remained on medical restrictions, including lifting no more than ten pounds and not pushing or pulling more than twenty-five pounds. (*Id.* at Pg. ID 947-48, 950-51.) By October 16, 2021, Plaintiff had exhausted her Modified Duty period, and she began a leave of absence. (*Id.* at Pg. ID 970-71.) During the ensuing months, Plaintiff's medical restrictions and return-to-work date were repeatedly modified, eventually resulting in medical restrictions lasting until August 1, 2022. (*Id.* at Pg. ID 1010.) This date allowed Plaintiff to request coverage of biceps tendinosis and undergo surgery for her injuries. (*Id.* at Pg. ID 999, 1001.) Plaintiff admitted that she could not perform her job functions with these medical restrictions. (*Id.* at Pg. ID 1010-11.)

On June 2, 2022, Plaintiff's supervisor, Schmidt, posted Plaintiff's position to fill the hospital's staffing needs. (Molinaro Dep., Doc. 22, Pg. ID 1013.) She also informed Plaintiff that, if the position was filled while Plaintiff was on leave, Plaintiff could apply

for administrative leave while looking for another position. (*Id.*) Schmidt then hired Jennifer Wetta, born in 1987, to fill Plaintiff's position on June 20, 2022. (*Id.*; Hoover Decl., Doc. 24-3, ¶ 4; Schmidt Dep., Doc. 18, Pg. ID 436.) On July 1, 2022, TriHealth sent Plaintiff a letter informing her that her leave of absence was due to expire on July 18, 2022, or 275 days from her first day of leave on October 16, 2021. (Molinaro Dep., Doc. 22, Pg. ID 1024; LOA Letter, Doc. 22-51, Pg. ID 1331.) The letter invited Plaintiff to contact TriHealth if she could return to work, with or without a reasonable accommodation. (LOA Letter, Doc. 22-51.) After contacting the LOA department, Plaintiff was permitted to pursue an accommodation request by August 1, 2022. (Molinaro Dep., Doc. 22, Pg. ID 1025-26, 1032.)

Meanwhile, Plaintiff's workers' compensation case manager, Janine Loyer, notified Plaintiff that her position had been filled, and that Plaintiff could not return to work through modified duty; Plaintiff then emailed Human Resources Business Partner Javan Jones to request an accommodation. (Molinaro Dep., Doc. 22, Pg. ID 1031.) Plaintiff returned the accommodation request form on July 28, 2022, identifying her impairment as "left arm weak; pain with some movements, i.e. lifting left arm with object in hand." (*Id.* at Pg. ID 1031-33.) The form also indicated that Plaintiff could only lift up to ten pounds. (*Id.* at Pg. ID 1033.) Schmidt completed TriHealth's portion of the form and determined that, in light of her medical restrictions, Plaintiff could not perform essential job functions of any available positions within the Emergency Department. (*Id.* at Pg. ID 1036-38.) On July 29, 2022, Jones informed Plaintiff that TriHealth denied her accommodation request but invited Plaintiff to request assistance with finding other positions or requesting leave. (*Id.* at Pg. ID 1042; *see also* Jones Letter, Doc. 22-58.) Plaintiff

8

sought additional leave until October 10, 2022, but TriHealth denied the request. (*Id.* at Pg. ID 1042-43; First Jones Email, Doc. 20-8.) Plaintiff reasserted her request. (Second Jones Email, Doc. 20-9.) On August 5, 2022, TriHealth notified Plaintiff that her leave of absence expired on August 1, 2022, and her employment had been terminated as of August 2, 2022. (Molinaro Dep., Doc. 22, Pg. ID 1042; Termination Letter, Doc. 22-59.)

**IV.     Plaintiff's Workers' Compensation Complaint and Subsequent Applications**

On August 29, 2022, Plaintiff filed a complaint against TriHealth with the Ohio BWC, alleging, in part, that TriHealth caused delays and denials of various treatments under her workers' compensation claim. (Molinaro Dep., Doc. 22, Pg. ID 1059; BWC Findings, Doc. 22-64.) The Ohio BWC denied Plaintiff's complaint throughout every stage of the process, so Plaintiff appealed to the BWC Self-Insuring Employers Evaluation Board ("BWC Board"). (Molinaro Dep., Doc. 22, Pg. ID 1059, BWC Findings, Doc. 22-64.) The BWC Board found that Plaintiff's claims lacked merit and dismissed her complaint. (Findings, Doc. 22-64.) Notably, the BWC Board found that TriHealth and Sedgwick had responded timely and appropriately to Plaintiff's claims and requests. (*Id.*)

In January 2023, Plaintiff applied for a Leave of Absence and Disability Case Management Coordinator position with TriHealth. (Molinaro Dep., Doc. 22, Pg. ID 1053-54.) The position expressly stated a preference for candidates with case management experience. (Case Management Coordinator Job Description, Doc. 23-2.) Plaintiff did not receive an interview for the position; instead, applicant Victoria Shearman was selected, but she later retracted her acceptance. (Pipes Dep., Doc. 19, Pg. ID 537-38; Hoover Decl., Doc. 24-3, ¶ 6.) Shearman had over a decade of applicable experience. (Pipes Dep., Doc.

19, Pg. ID 537-38; Hoover Decl., Doc. 24-3, ¶ 6.) Plaintiff contacted Jones, wishing to re-apply for the position, but the hiring manager, Diane Pipes, indicated that Plaintiff was not a good fit for the position. (Molinaro Dep., Doc. 22, Pg. ID 1057-58; Pipes Dep., Doc. 19, Pg. ID 539-40.) Pipes instead hired Erika Gomez, born in 1987, who had extensive experience performing case management work. (Hoover Decl., Doc. 24-3, ¶ 8.) Pipes believes that she knew of Plaintiff's July 2022 accommodation request at that time. (Pipes Dep., Doc. 19, Pg. ID 528.)

## PROCEDURAL POSTURE

On January 27, 2023, Plaintiff filed her Complaint against TriHealth in Hamilton County Court of Common Pleas. (Compl., Doc. 2.) The Complaint contained a single claim: workers' compensation retaliation in violation of Ohio Revised Code § 4123.90. (*Id.*) On June 23, 2023, Plaintiff amended her Complaint to include seven claims: (1) workers' compensation retaliation under O.R.C. § 4123.90; (2) age discrimination under O.R.C. § 4112; (3) age discrimination under the Age Discrimination in Employment Act ("ADEA"); (4) disability discrimination under O.R.C. § 4112; (5) disability discrimination under the Americans with Disabilities Act ("ADA"); (6) retaliation under O.R.C. § 4112; and (7) retaliation under the ADEA and ADA. (First Am. Compl., Doc. 4.) On June 26, 2023, TriHealth removed the case to this Court under federal question jurisdiction and answered the First Amended Complaint. (*See* Notice of Removal, Doc. 1; Answer, Doc. 5.) The parties engaged in discovery and TriHealth filed its Motion for Summary Judgment on May 12, 2025, which has been fully briefed. (*See* Docs. 25, 26, 29.) Plaintiff then filed a Motion to Strike (Doc. 27), seeking to exclude materials TriHealth used in

10

support of the Motion. The Court, construing the Motion as Objections, overruled the Objections. (*See* Order, Doc. 32.)

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forth probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

TriHealth argues that it is entitled to summary judgment on all claims that Plaintiff brings. At the summary judgment stage, when a plaintiff has not presented any direct

evidence of discrimination, like here, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, a plaintiff faces the initial burden of presenting a prima facie case, which "creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000)). Once the defendant satisfies this burden, the plaintiff must prove that the defendant's proffered reason was a "pretext to hide unlawful discrimination." *Id.* (quoting *Johnson*, 215 F.3d at 573). This standard applies to all of Plaintiff's claims except for her failure to accommodate claim, which "necessarily involves direct evidence." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024).

In federal court, federal and Ohio discrimination claims are analyzed under the same standards. *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 457 (6th Cir. 2004). Accordingly, where Plaintiff brings concurrent claims under both federal law and Ohio Revised Code § 4112, the Court will consider them together. The following analysis examines each claim or set of claims in turn.

## I.    Disability Discrimination Claims

TriHealth contends that Plaintiff's disability discrimination claims under both the ADA and O.R.C. § 4112 fail as a matter of law. (Motion, Doc. 25, Pg. ID 1583.) First, TriHealth notes that Plaintiff's failure to accommodate claim fails because she did not allege a failure to accommodate claim. (*Id.* (citing *Sales v. Inventiv Health, Inc.* No. 3:13-

CV-64, 2014 WL 1883936 (M.D. Tenn. May 12, 2014)).) As the Court reads the Amended Complaint, Plaintiff's disability discrimination claims center on allegations that TriHealth treated her less favorably than nondisabled employees, terminated her because of her disability, and refused to hire her for a different position because of her disability. (First Am. Compl., Doc. 4, ¶¶ 100-13.) But, in the factual allegations section of the Complaint, Plaintiff states that TriHealth denied her accommodation requests without engaging in an interactive process. (*Id.* at ¶¶ 66-67.) And, Plaintiff's disability discrimination claims incorporate all of the allegations of the Complaint. (*Id.* at ¶¶ 100, 107.) While TriHealth argues that the court in *Sales* found that the plaintiff did not properly allege a failure to accommodate claim, Plaintiff correctly distinguishes her complaint. (Response, Doc. 26, Pg. ID 1615.) As Plaintiff points out, in *Sales*, the complaint did not allege any facts regarding the defendant's failure to accommodate the plaintiff's disability; meanwhile, here, Plaintiff does allege that TriHealth failed to provide her requested accommodations. (*Id.*) Thus, the Court will construe the theory underlying Plaintiff's disability claims as twofold: (1) TriHealth's failure to accommodate her disability and (2) her disparate treatment and termination because of her disability.

### a. Failure to Accommodate

In order to establish a prima facie failure to accommodate claim, Plaintiff must show that: (1) she is disabled; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) her employer knew or had reason to know of her disability; (4) she requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation. *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347,

350 (6th Cir. 2015). TriHealth does not contest that Plaintiff is disabled or that TriHealth knew of her disability but argues that Plaintiff has failed to establish the second, fourth, and fifth elements of her claim. (Motion, Doc. 25, Pg. ID 1583.) The Court addresses each of these elements below.

### i. Second Element: Qualification for the Position

To show the second element, Plaintiff must demonstrate that she could complete her job requirements either: "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022) (cleaned up). Meanwhile, "the employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Cooper*, 93 F.4th at 368. TriHealth asserts that Plaintiff cannot demonstrate any of these. (Motion, Doc. 25, Pg. ID 1583-84.) First, TriHealth points out that Plaintiff was unable to perform essential functions of her Staff RN position because of the medical restrictions in place, namely, her inability to lift more than ten pounds and her limitation on pushing or pulling more than twenty-five pounds. (*Id.* at Pg. ID 1584.) Meanwhile, the position required consistently lifting more than thirty-five pounds, in addition to physically demanding tasks such as administering CPR, pushing patients in wheelchairs, and turning and lifting patients in hospital beds. (*Id.*) And, TriHealth argues that Plaintiff's requested accommodations were not reasonable; accordingly, she was not qualified. (*Id.*)

Plaintiff makes an argument that she could have performed her job without accommodation. (Response, Doc. 26, Pg. ID 1618.) Plaintiff states that her supervisor, Schmidt, made "negative assumptions" that she could not perform her job duties, despite Plaintiff only "identiff[ying] areas of potential concern, but never stat[ing] that she would be incapable of performing those functions." (*Id.*) However, on Plaintiff's MEDCO-14 from July 16, 2021, the physician checked "yes" to indicate that Plaintiff's cervical, thoracic, and lumbar spine sprain and rotator cuff sprain "prevent[ed] full duty release to the job [Plaintiff] held on the date of the injury." (7/16/21 MEDCO-14, Doc. 22-15, Pg. ID 1218.) She continued to be unable to perform the full range of job duties, as she requested modified duty, and then when she had exhausted that, requested a leave of absence. Through September and October 2021, Plaintiff remained on medical restrictions, including lifting no more than ten pounds and not pushing or pulling more than twenty-five pounds. (Molinaro Dep., Doc. 22, Pg. ID 947-48, 950-51, 970-71.) And, the Sixth Circuit has held that, when a plaintiff's physician "concludes that the plaintiff cannot perform [her] job without an accommodation, the plaintiff likely cannot establish that [s]he is otherwise qualified to perform the job without an accommodation." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 370 (6th Cir. 2024); *see also Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (per curiam). Thus, the Court finds Plaintiff's first argument unconvincing.

As Plaintiff indeed requested accommodations in order to complete her job, the Court will now examine whether Plaintiff could have performed her job with the proposed accommodations and whether such proposals were reasonable. Plaintiff

requested the following accommodations: (1) a limited duty role as a Triage Nurse; and (2) a temporary extension of her leave until October 2022. (Response, Doc. 26, Pg. ID 1620-21.) "In failure-to-accommodate claims where the employee requests an accommodation that *exempts* her from an essential function, the essential functions and reasonable accommodation analyses run together." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (cleaned up). This is because "[o]ne conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *Id.*

With this framing in mind, the Court naturally begins with the question of identifying the relevant essential job functions. Plaintiff argues that whether these tasks are essential functions of the job is a question of fact "not suitable for resolution on a motion for summary judgment." (Response, Doc. 26, Pg. ID 1618.) Yet, while courts acknowledge that this question can be one of fact, they also have held that, in certain cases, "the determination of 'essentialness' . . . is properly a question of law" that can be addressed at the summary judgment stage. *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998); *see also Ford Motor Co.*, 782 F.3d at 765-66. Indeed, in *Brickers*, the Sixth Circuit found that because the job qualifications listed the ability to lift as a requirement of the plaintiff's position, the question of whether that was essential to the job was one of law. *Brickers*, 145 F.3d at 849. The same is true here, as the job description lists the ability to consistently lift fifty pounds as a qualification for the position. (Job Description, Doc. 22-2, Pg. ID 1140.) Generally, "an employer's job description is given weight and it is on the plaintiff to 'rebut the written job description concerning what constitutes an essential function of a job.'" *Equal Emp. Opportunity Comm'n v. Clarksville Health Sys., G.P.*, 617 F.

16

Supp. 3d 844, 860 (M.D. Tenn. 2022) (quoting *Camp v. BI-LO, LLC*, 662 F. App'x 357, 362 (6th Cir. 2016)). That said, courts "must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1023 (6th Cir. 2013) (quotation omitted). But, Plaintiff testified that the position of a Staff RN is a physically demanding job and can include frequent bending, pushing, and reaching, as well as consistent lifting of objects over thirty-five pounds. (Molinaro Dep., Doc. 22, Pg. ID 864-65, 1033-34.) Here, both the job description and actual performance support an essential function finding. The Court thus finds that lifting above fifty pounds is an essential duty of the job.

Nevertheless, Plaintiff asserts that she was qualified for the position with her accommodations. (Response, Doc. 26, Pg. ID 1618.) Plaintiff argues that her previous supervisor, Lebowitz, testified that Plaintiff was qualified for her position, even with her mobility restrictions. (*Id.* at Pg. ID 1619.) But, TriHealth notes that Lebowitz's testimony referred to Plaintiff's skillset and experience as a nurse, rather than the legal definition of "qualified" for purposes of a disability discrimination claim. (Reply, Doc. 29, Pg. ID 1880-81.) As evidence of this, TriHealth points to Lebowitz's statements that Plaintiff was unable to perform her job duties without assistance from other team members, and "the position of Triage Nurse was not a designated position outside of temporary modified duty work." (*Id.; see also* Lebowitz Dep., Doc. 21, Pg. ID 747-50.) Thus, from TriHealth's perspective, Lebowitz herself testified that Plaintiff was not qualified for the position for purposes of her disability discrimination claim. (*Id.*)

17

Still, Plaintiff disputes that the job requires nurses to consistently lift fifty pounds, as stated in the job description, but states instead that the job did require nurses to consistently lift thirty-five pounds. (Response, Doc. 26, Pg. ID 1619; *see also* Plaintiff's Dep., Doc. 22, Pg. ID 866-67.) Although Plaintiff admits that, due to her medical restrictions, she could not lift thirty-five pounds, she emphasizes that the reduced capacity was only temporary. (*Id.* at Pg. ID 1619.) However, as TriHealth points out, Plaintiff cites no authority to support her contention that she was qualified for the role because she could be excused from functions only on a temporary basis. (Reply, Doc. 29, Pg. ID 1880.)

TriHealth contends, instead, that Plaintiff could not be reasonably accommodated in the Staff RN position. (Motion, Doc. 25, Pg. ID 1585.) Plaintiff first requested a modified job duty of only desk or sedentary work, but TriHealth points out that, with this accommodation, the more physical tasks of her job would be shifted onto another individual, such as an ER Technician. (*Id.*) As TriHealth notes, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." (*Id.* (citing *Hoskins v. Oakland Cty. Sheriff's Dep't.*, 227 F.3d 719, 729 (6th Cir. 2000)).)

Plaintiff, though, argues that her request for modified duty was reasonable, as she had successfully completed the same modified duty in the past. (Response, Doc. 26, Pg. ID 1620.) According to Plaintiff, while the ADA does not require the shifting of essential functions, it does "require an employer to restructure the marginal functions of a job as a reasonable accommodation." (*Id.* (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 922 (6th Cir. 2013)).) Plaintiff argues that her requested accommodation of a modified duty was

18

merely a restructuring of a marginal function of the job. (*Id.*) As evidence of its reasonableness, Plaintiff points to the fact that she had previously performed the role of a Triage Nurse "satisfactorily," and that her modified position would not have rendered the ER understaffed, as a new nurse, Jenna Wetta, had replaced her at that time. (*Id.*) And, from Plaintiff's perspective, TriHealth cannot simultaneously state that the ER would be understaffed while also arguing that Plaintiff's requested position was irregular and not needed at all times. (*Id.*)

However, the Court finds Plaintiff's argument unpersuasive. The ability to push and lift consistently is not merely a "marginal function" of her role, but is essential, as described above. And, Lebowitz testified that Plaintiff's inability to perform these functions when on modified duty meant that other ER nurses had to take over these functions. (Lebowitz Dep., Doc. 21, Pg. ID 747-50.) As TriHealth convincingly argues, "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins,* 227 F.3d at 729. This holds true even if the proposed accommodation arrangement would only be temporary. *See Wyatt v. Nissan N. Am., Inc.,* 999 F.3d 400, 419 (6th Cir. 2021).

Furthermore, Lebowitz testified that the Triage Nurse position was not a permanent position but "an assignment among the ER nurses." (Lebowitz Dep., Doc. 21, Pg. ID 724.) And, the ADA "does not require employers to create new jobs [or] displace existing employees from their positions in order to accommodate a disabled individual." *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 869 (6th Cir. 2007) (quoting *Burns v. Coca-Cola Enters., Inc.,* 222 F.3d 247, 257 (6th Cir. 2000) (cleaned up)); *see also Tchankpa v. Ascena*

19

*Retail Grp., Inc.*, 951 F.3d 805, 809 (6th Cir. 2020). Thus, Plaintiff's requested accommodation to perform only desk or sedentary work was not reasonable. While Lebowitz may have been amenable to Plaintiff's accommodation, her amenability does not necessarily render the accommodation reasonable. Lebowitz admitted that, with Plaintiff's inability to perform physical tasks, ER resources and personnel were pulled from other areas and tasks to assist her. (Lebowitz Dep., Doc. 21, Pg. ID 748-49.) Furthermore, the accommodation did not allow her to continue performing her essential job functions; in fact, the accommodation eliminated several key functions to the role of a Staff RN.

Thus, there is no genuine dispute of material fact as to whether Plaintiff was qualified to perform the Staff RN position. Put simply, she could not perform its requirements with or without a proposed reasonable accommodation.

### ii.     Fourth Element: Reasonable Accommodation

TriHealth argues that Plaintiff's claim also fails on the fourth element: that Plaintiff's requested accommodation was reasonable. As discussed above, the Court determined that her modified duty request was unreasonable. However, Plaintiff also requested extended administrative leave as an accommodation. TriHealth contends that this request, too, was unreasonable. (Motion, Doc. 25, Pg. ID 1587-88.) To be sure, Plaintiff began her leave on October 16, 2021, and requested six extensions, resulting in leave that spanned over nine months. (Molinaro Dep., Doc. 22, Pg. ID 1024; LOA Letter, Doc. 22-51, Pg. ID 1331.) And, Plaintiff's doctor testified that her final leave request seeking a return date in October 2022 "was only an estimate." (Motion, Doc. 25, Pg. ID 1587.)

20

TriHealth points to several Sixth Circuit cases where the court found that "additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" (Molinaro Dep., Doc. 22, Pg. ID 1024; *see also Caldwell v. MGM Grand Detroit, LLC*, No. 23-1436, 2024 WL 2182406, at *3 (6th Cir. Jan. 5, 2024); *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000).) Indeed, TriHealth notes that Plaintiff requested two months of leave after almost ten months of leave, with "no substantive improvement to her restrictions," and "no clear prospect of recovery," making it entirely uncertain whether she would return. (*Id.*) Courts have found similar requests unreasonable. *See, e.g., Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 298 (6th Cir. 2015) (finding requested leave unreasonable where employee had already taken 6 months of leave and his return was unknown); *Maat v. Cty. of Ottawa, Mich.*, 657 F. App'x 404, 412 (6th Cir. 2016) (finding the same after seven months of a reduced schedule without a clear prospect of recovery).

In response, Plaintiff argues that her return was definite and that none of the Sixth Circuit cases "adopt a brightline rule defining a maximum duration of leave that can constitute a reasonable accommodation." (Response, Doc. 26, Pg. ID 1621.) As evidence of her definite return date, Plaintiff states that her doctor provided the estimated return date of October 2022. (*Id.*) Plaintiff also describes three factors that courts generally examine when assessing reasonableness: (1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery. (*Id.* (citing *King v.*

*Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 562 (6th Cir. 2022)).) But, to this point, Plaintiff had already requested the maximum amount of leave permitted by TriHealth's policies: nine months of leave, or 275 days. (LOA Policy, Doc. 22-7, Pg. ID 1168; Molinaro Dep., Doc. 22, Pg. ID 1042; Termination Letter, Doc. 22-59.) And, on the prospect of her recovery, TriHealth is correct to point out that all of her initial requests for leave up until then included an estimated return date, and all of them were subsequently extended. (Reply, Doc. 29, Pg. ID 1884.) Furthermore, Plaintiff's medical restrictions in July 2022 were more severe than they were when her leave began in October 2021, highlighting her lacking prospect of recovery. (*Id.*; *compare* 10-20-21 MEDCO-14, Doc. 22-36 ("no lifting over 10 lbs [with left] arm, no reaching above shoulder, occasional push/pull up to 25 lbs"), *with* 7-5-2022 MEDCO-14 ("no lifting, pushing, or pulling any greater than 10 pounds with left arm.").)

For all these reasons, the Court agrees with TriHealth. Plaintiff's situation is strikingly similar to those in *Aston* and *Maat*. TriHealth extended Plaintiff's leave multiple times as she repeatedly bumped out her estimated return date. (Molinaro Dep., Doc. 22, Pg. ID 993-97, 1016.) While Plaintiff claims she would have been able to return to work with full functionality, her worsening restrictions and pattern of extensions is evidence of the contrary. And, most detrimental to her claim, Plaintiff was aware that TriHealth's leave policy maxed out at 275 days. (Molinaro Dep., Doc. 22, Pg. ID 888.) Medical leave is not reasonable when the leave "extend[s] beyond company policies." *King*, 30 F.4th at 563 (collecting cases). Her final request for leave was not reasonable. The Court, therefore, finds no genuine dispute of material fact as to the reasonableness of both of Plaintiff's

requested accommodations. And, with no reasonable accommodation, Plaintiff does not have an independent claim for TriHealth's failure to engage in the interactive process. *Wheat v. Columbus Bd. of Educ.*, 644 F. App'x 427, 430 (6th Cir. 2016); *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

*       *       *

As Plaintiff did not make a reasonable accommodation request, the Court finds that Plaintiff has also failed to demonstrate the fifth element, as an employer cannot deny a reasonable accommodation if such an accommodation is never requested. Without the second, fourth, and fifth elements, Plaintiff has not established a prima facie failure to accommodate claim; TriHealth is entitled to summary judgment on this claim.

### b. Remaining Disability Discrimination Claims

Plaintiff also brings claims under O.R.C. § 4112 and the ADA challenging TriHealth's termination and refusal to rehire her as disability discrimination actions. (First Am. Compl., Doc. 4, ¶¶ 100-13.) TriHealth asserts that Plaintiff cannot establish a prima facie case for these claims, which requires that Plaintiff show: (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) TriHealth knew or had reason to know of her disability; and (5) the position remained open while TriHealth sought other applications or she was replaced. (Motion, Doc. 25, Pg. ID 1589.)

Plaintiff does not address TriHealth's argument or otherwise defend these claims. (*See generally* Response, Doc. 26.) So, TriHealth is correct to point out that Plaintiff has abandoned these claims. (Reply, Doc. 29, Pg. ID 1887; *Alexander v. Carter for Byrd*, 733 F.

23

App'x 256, 261 (6th Cir. 2018) ("When a plaintiff fails to address [a claim] in response to a motion for summary judgment, the claim is deemed waived.") (cleaned up).) The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Accordingly, TriHealth is entitled to summary judgment on Plaintiff's disability discrimination claims.

## II. Age Discrimination Claims

TriHealth next takes issue with Plaintiff's claims of age discrimination, brought under both O.R.C. § 4112 and the ADEA. (Motion, Doc. 25, Pg. ID 1590-91.) To survive summary judgment, Plaintiff must demonstrate a prima facie case of age discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004). To do so, she must show: (1) she was at least forty years old at the time of her dismissal; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a younger person. *Id.* TriHealth challenges the third element, that Plaintiff was qualified for the position. (Motion, Doc. 25, Pg. ID 1591.) TriHealth exclusively relies on its previous arguments that Plaintiff was not qualified for the Staff RN position. (*Id.*) And, in response, Plaintiff does the same in arguing that she was, in fact, qualified for the position. (Response, Doc. 26, Pg. ID 1629.) The Court will not rehash the same analysis conducted above. As previously established, there is no genuine dispute that Plaintiff was not qualified for the Staff RN position. Simply put, undisputed evidence shows that she was not capable of performing the essential functions of the role. *See Leiper v. Sloter*

24

*Concrete*, No. 2:05-CV-464, 2006 WL 2035658, at *2 (S.D. Ohio July 18, 2006). Plaintiff's prima facie case for her termination-based claim fails on the third element.

Yet, Plaintiff also argues that she was not hired for the Case Management Coordinator role because of her age. (First Am. Compl., Doc. 4, ¶¶ 84-99.) TriHealth does not dispute any elements of the prima facie case for this claim but argues that it chose candidates who were more qualified than Plaintiff for the position. (Motion, Doc. 25, Pg. ID 1591.) Accordingly, in TriHealth's estimation, Plaintiff cannot show that its non-selection was pretext for discrimination. (*Id.*)

The job description for the Case Management Coordinator position noted "case management experience" as a preferred qualification, including "return to work coordination." (*See* Case Management Coordinator Job Listing, Doc. 23-2.) Pipes, the hiring manager, testified that case management experience and occupational health experience are some of the first things she looks for when making hiring decisions for that role. (Pipes Dep., Doc. 19, Pg. ID 537-38.) However, the job listing states that "[s]trong clinical background is acceptable in lieu of case management experience." (Case Management Coordinator Job Listing, Doc. 23-2.) Plaintiff argues that she has "20 years of excellent nursing experience compared to the much younger candidates hired in her place." (Response, Doc. 26, Pg. ID 1629.) Thus, according to Plaintiff, TriHealth's argument that the other candidates were more qualified for the position is illegitimate and pretext for age discrimination. (*Id.*)

TriHealth, though, points out that Plaintiff has not presented any evidence that she was more qualified for the position than the hired individuals, both of whom had

case management experience that she did not have. (Reply, Doc. 29, Pg. ID 1888.) When considering the relative qualifications of the plaintiff and the hired individual, "[r]elative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination." *Bartlett v. Gates*, 421 F. App'x 485, 490-91 (6th Cir. 2010). As Plaintiff here lacks any case management coordination experience, and both hired individuals have such experience, Plaintiff is not the "plainly superior candidate."

Turning to the second consideration, TriHealth notes that "Plaintiff has failed to offer any evidence that her nursing experience made her as qualified or more qualified than the candidates selected." (Reply, Doc. 29, Pg. ID 1888.) This point is underscored by the fact that Pipes testified that relevant case management experience is one of the first qualities she looks for in potential candidates. (Pipes Dep., Doc. 19, Pg. ID 537-38.) And, assuming arguendo that Plaintiff's clinical experience made her as qualified as the candidates with alternative experience, the record is devoid of other probative evidence of age discrimination. Plaintiff can only point to notes in her file that she was near retirement age or planning to retire. (*See* Workers' Compensation Notes, Doc. 17-5.) Isolated and ambiguous comments about retirement are not sufficient to show pretext. *Shristava v. RBS Citizens Bank*, 227 F. Supp. 3d 824, 841 (E.D. Mich. 2017) (collecting cases). Thus, Plaintiff cannot establish that TriHealth's reason for her non-selection was pretext

for age discrimination. TriHealth is entitled to summary judgment on her age discrimination claims.

### III. Retaliation Claims

Plaintiff's next set of claims assert causes of action for retaliation in violation of O.R.C. § 4112, the ADA, and the ADEA. (First Am. Compl., Doc. 4, ¶¶ 114-125.) These counts state that TriHealth retaliated against Plaintiff for engaging in three protected activities: her medical leave requests, her complaints of age and disability discrimination, and her charges of discrimination with the EEOC. (*Id.*) To establish a prima facie retaliation claim, Plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) TriHealth knew of her exercise of this activity; (3) TriHealth then took a materially adverse action against Plaintiff; and (4) a causal connection between the protected activity and the adverse action exists. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). TriHealth contends that Plaintiff has failed to establish the fourth element. (Motion, Doc. 25, Pg. ID 1593.) Plaintiff asserts that she was both fired from TriHealth and not hired as a Case Management Specialist because she engaged in her protected activities; the Court will examine each adverse action independently.

### a. Plaintiff's Termination as the Adverse Action

To prove a causal connection, Plaintiff must show that her protected activity was the but-for cause of her adverse employment action. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 532 (6th Cir. 2020). TriHealth argues that Plaintiff cannot establish this causation because "the mechanisms surrounding her leave exhaustion began before Plaintiff engaged in protected activity." (Motion, Doc. 25, Pg. ID 1594.) As TriHealth

points out, "[c]ausal connection is not met where considerations regarding an end to employment have already started." (*Id.* (citing *Land v. S. States Coop., Inc.,* 740 F. App'x 845, 850 (6th Cir. 2018)).) According to TriHealth, Plaintiff was notified that her employment would end when her leave was exhausted before she engaged in a protected activity. (*Id.*) Plaintiff correctly points out, though, that one of her protected activities was requesting both modified duty and leave as accommodations under the ADA, both of which occurred before she was notified of her termination. (Response, Doc. 26, Pg. ID 1624.) Further, Plaintiff distinguishes her case from *Land* by pointing out that, in *Land*, the plaintiff had documented performance issues well in advance of when he engaged in a protected activity, whereas here, Plaintiff was notified that she would exhaust her leave and be terminated after she requested her accommodations. (*Id.* at Pg. ID 1624-25.)

Yet, in its Reply, TriHealth notes that Plaintiff's argument "concedes that she first engaged in protected activity more than a year before her employment ended" when she requested modified duty. (Reply, Doc. 29, Pg. ID 1888.) This concession thus demonstrates that TriHealth accommodated Plaintiff "despite engaging in protected activity." (*Id.*) And, Plaintiff's only evidence of retaliatory motive is temporal proximity of her requests for accommodation and her termination. (*Id.* at Pg. ID 1889.) But, as well established in the Sixth Circuit, barring narrow exceptions of events that happen extremely close in time, "temporal proximity, without more, fails to establish causation, particularly when the events are separated for extended periods of time." (*Id.* (collecting cases).) Furthermore, TriHealth points out that Plaintiff's exhaustion of leave under its policy "breaks any causal connection with her separation of employment." (*Id.*) Indeed,

"an intervening cause between a protected activity and an adverse employment action dispels an inference of causation." (*Id.* (quoting *Kenney v. Aspen Techs., Inc.,* 965 F.3d 443, 450 (6th Cir. 2020)).)

The Court finds TriHealth's arguments persuasive. To reiterate, Plaintiff first requested modified duty as an accommodation in July 2021; she then repeatedly requested either modified duty or leave extension until her termination in August 2022. Thus, although Plaintiff's final request for a leave extension happened very close in time to her termination, her engagement in the protected activity of requesting accommodations began in July 2021, over a year earlier. While an adverse employment action that occurs very close in time after an employer learns of a protected activity" can be significant enough to establish causal connection, a year is too long to establish a causal connection. *Barrow v. City of Cleveland*, 773 F. App'x 254, 263 (6th Cir. 2019) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)); *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (finding that the cutoff for temporal proximity alone to satisfy causation is around the ten-week mark). And, TriHealth indeed first learned of Plaintiff's protected activity in July 2021, not August 2022.

When the protected activity and the adverse action do not happen close together, "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (collecting cases). And, "this is especially so when an intervening act disrupts the purported causal chain between a protected act and an adverse employment action." *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43, 47 (6th Cir. 2020) (finding temporal proximity

particularly insufficient for causal connection because plaintiff violated his back-to-work agreement, the reason for his termination); *see also Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013). Plaintiff can only point to temporal proximity as evidence of a causal connection, an insufficient argument further weakened by the fact that TriHealth terminated her after she had exhausted its leave policy, an intervening act. Thus, Plaintiff has failed to establish the fourth element of her retaliation claims as they relate to her termination.

### b. Plaintiff's Failure to be Rehired as the Adverse Action

Plaintiff also argues that TriHealth retaliated against her by not hiring her for the Case Management Coordinator position. Again, TriHealth argues that Plaintiff has failed to show a causal connection between her protected activities and her non-selection for the role. (Motion, Doc. 25, Pg. ID 1594.) The hiring manager, Pipes, was only aware that Plaintiff had made an accommodation request in July 2022. (*Id.*) And, Pipes made her hiring decisions in January and February 2023. (*Id.*) Once again, TriHealth argues that Plaintiff can only show temporal proximity, and the five-month span here is insufficient to create a causal connection. (*Id.*)

In response, Plaintiff points out that she filed her EEOC charge in December 2022, and the Case Management Coordinator position was the first TriHealth job to which she applied after her filing. (Response, Doc. 26, Pg. ID 1625-26.) This rejection was thus the first opportunity TriHealth had to retaliate against her after her EEOC charge. (*Id.* (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 467-68 (6th Cir. 2020)).) Plus, according to Plaintiff, the temporal proximity of just one month is sufficient to show causation. (*Id.* at

Pg. ID 1626.) But, TriHealth points out that, in fact, Pipes did not know of the EEOC charge and only knew of Plaintiff's previous accommodation requests. (Reply, Doc. 29, Pg. ID 1889.) Plaintiff identifies no evidence to the contrary. Thus, the time period between the protected activity and alleged retaliatory conduct is five months. (*Id.*)

Plaintiff also argues that she does not rely solely on temporal proximity to prove causation; rather, she contends that TriHealth "consistently violated its own internal policies which were meant to provide [her] time to find a new position while still employed." (Response, Doc. 26, Pg. ID 1626.) And, according to Plaintiff, Pipes relied on job criteria not present in the position's job description when deciding whether to interview or hire Plaintiff. (*Id.*) These irregularities in the hiring process, in addition to the temporal proximity, establish a prima facie retaliation case, according to Plaintiff. (*Id.*)

In response to this argument, though, TriHealth notes that it was consistent in applying its leave policies: "any combination of leave is generally not permitted to exceed 275 days." (Reply, Doc. 29, Pg. ID 1890.) Further, TriHealth points out that when Jones from Human Resources offered Plaintiff assistance in finding a new position while she was employed, Plaintiff instead repeated her request for extended leave. (*Id.*) This fact undercuts Plaintiff's argument that TriHealth violated its own policies by not allowing Plaintiff to find new work. (*Id.*) And, TriHealth asserts that Plaintiff's statement about Pipes making a hiring decision based on criteria not found in the job listing is baldly false. (*Id.*) As stated, the job description states that "case management experience was a preferred qualification, including 'return to work coordination.'" (*Id.*; *see also* Case Management Coordinator Job Listing, Doc. 23-2.) Pipes also testified that case

management experience and experience in occupational health are some of the first things she looks for when making hiring decisions for that role. (*Id.* (citing Pipes Dep., Doc. 19, Pg. ID 537-38).) Although the job listing states that "[s]trong clinical background is acceptable in lieu of case management experience," TriHealth argues that the job clearly prioritizes case management experience above clinical experience, as it is listed first. (*Id.*)

First, on the issue of whether Pipes knew of Plaintiff's most recent protected activity, the EEOC charges, the Court finds Plaintiff's argument unpersuasive. Plaintiff has not put forth any evidence that Pipes knew Plaintiff filed charges with the EEOC; the only evidence on the record indicates that Pipes knew about Plaintiff's accommodation requests, which occurred, at the latest, five months before she applied for the position. *See Watson v. Ohio Dept. of Rehab. & Corr.*, 167 F. Supp. 3d 912, 935-36 (S.D. Ohio 2016) (plaintiff put forth no evidence that the hiring managers were aware of her OCRC Charges, so she failed to establish the fourth element of a prima facie retaliation claim). Thus, Plaintiff's arguments that only a month passed between her protected activity and non-selection, and that the non-selection was TriHealth's first chance to retaliate against her for that activity, hold no water.

Moving on, the Court finds little weight to Plaintiff's arguments that TriHealth violated its own policies by not allowing her to find a new position while working. As TriHealth points out, Jones offered to assist Plaintiff in finding a new position when she was still employed. (Jones Letter, Doc. 22-58.) To Plaintiff's argument that Pipes relied on criteria not included in the job description, the Court highlights that the job was a Case Management Coordinator, with clinical experience only listed as an alternative to case

management experience. (Case Management Coordinator Job Listing, Doc. 23-2.) Taken together with Pipes' testimony that such experience is "one of the first things that [the hiring managers] look for," it is reasonable that TriHealth would select candidates with case management experience over an individual with only clinical experience. (*See* Pipes Dep., Doc. 19, Pg. ID 538.) Indeed, the two candidates TriHealth hired both had extensive case management experience, while Plaintiff had none. (Hoover Decl., Doc. 24-3, ¶¶ 6-8.) Courts have found that no causal connection exists in failure-to-hire retaliation claims when the chosen candidate has preferred qualifications. *See, e.g., Bachochin v. Shire US Inc.*, No. 1:06-CV-486, 2009 WL 10710454, at *7 (S.D. Ohio Mar. 27, 2009) (finding that a hiring policy that favored one candidate over the plaintiff negated a causal link between the protected activity and non-selection).

This leaves Plaintiff with only the five-month period between the protected activity known to Pipes and her non-selection as evidence of a retaliatory motive. But, as established above, temporal proximity alone is not generally sufficient to establish a causal connection. *See Lahar v. Oakland Cty.*, 304 F. App'x 354, 359 (6th Cir. 2008) (explaining that "a five-month gap in time does not by itself suffice to get to a jury on causation"); *see also Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (finding the same for a four-month gap). Accordingly, Plaintiff cannot demonstrate a prima facie case for her retaliation claims based on her non-selection to the new job. But, assuming that Plaintiff were able to establish a prima facie case, TriHealth's reasoning that the other candidates were better qualified is sufficient as a legitimate, nondiscriminatory reason for Plaintiff's non-selection. *Merhulik v. Weltman, Weinberg &*

33

*Reis Co. LPA*, No. 21-3773, 2022 WL 1583418, at *6 (6th Cir. May 19, 2022). Pipes testified that Plaintiff simply did not have case management experience while other candidates "had more applicable experience." (Pipes Dep., Doc. 19, Pg. ID 537.) Plaintiff has not shown any other evidence that this reason is pretext for retaliation. TriHealth is entitled to summary judgment on these claims as well.

### IV.    Workers' Compensation Retaliation Claim

Finally, Plaintiff brings a claim for workers' compensation retaliation under O.R.C. § 4123.90. (First Am. Compl., Doc. 4, ¶¶ 76-83.) To establish a prima facie workers' compensation retaliation claim, Plaintiff needs to show: (1) that she filed a workers' compensation claim; (2) that TriHealth took an adverse employment action against her; and (3) that a causal link exists between Plaintiff's filing of the claim and the adverse employment action. *Sharp v. Profitt,* 674 F. App'x 440, 444 (6th Cir. 2016). If she establishes her prima facie case, the burden shifts to TriHealth to show a legitimate, non-retaliatory reason for its actions; if successful, Plaintiff then must demonstrate that the reason is pretext for retaliation. *Onderko v. Sierra Lobo, Inc.*, 20 N.E.3d 322, 326 (Ohio Ct. App. 2014). Just as with the other retaliation claims, TriHealth argues that Plaintiff has failed to show that her termination or non-selection is causally connected to her workers' compensation claim. (Motion, Doc. 25, Pg. ID 1595.) To start, TriHealth points to the lack of temporal proximity of the events: one year between Plaintiff's filing of her first workers' compensation claim and her termination, as well as an eighteen-month period between the claim and her non-selection for the new position. (*Id.*) Beyond this, according to TriHealth, Plaintiff "has not identified any actions or comments suggesting that relevant

34

decisionmakers held a retaliatory bias against Plaintiff for filing a workers' compensation claim." (*Id.* at Pg. ID 1595-96.)

In response, Plaintiff notes that "[t]he inference of retaliatory motive may be drawn from the surrounding circumstances, including the timing of the discharge relative to the protected conduct, whether punitive action was directed toward the employee as a result of the claim, a hostile attitude[] toward the employee once the claim was filed, disparate treatment of the employee relative to others, and requests not to pursue a claim." (Response, Doc. 26, Pg. ID 1611 (quoting *Creveling v. Lakepark Indus.*, 169 N.E.3d 21, 28 (Ct. App. Ohio 2021)).) Accordingly, the timeline of Plaintiff's claims and adverse actions "should not preclude" finding a causal link "because the series of delays in approvals for [her] claims, treatments, and surgery were themselves part of TriHealth's retaliatory scheme." (*Id.*) For instance, Plaintiff claims that she requested approval of her recommended surgery on August 2, 2021, but did not receive approval until March 7, 2022, which wasted a significant portion of her allowed leave time under TriHealth's policy. (*Id.* at Pg. ID 1611-12.) TriHealth, however, disputes this by pointing out that she received a referral for surgery on August 2, 2021, which was granted on September 7, 2021. (Reply, Doc. 29, Pg. ID 1893.)

Plaintiff also states that records in her workers' compensation claim show that TriHealth labeled her as "negative," that "she gets upset about everything." (Response, Doc. 26, Pg. ID 1612; *see also* Workers' Compensation Claim Notes, Doc. 17-5.) And, Plaintiff argues that TriHealth insisted she make two separate claims for her two injuries, which then caused confusion and unnecessary delay. (*Id.*) But, TriHealth points out that

the BWC Board found that "TriHealth timely certified [Plaintiff's] claim, and that each treatment request was timely addressed." (Reply, Doc. 29, Pg. ID 1893; *see also* BWC Findings, Doc. 22-64.) As far as the delays, TriHealth argues that Plaintiff herself delayed the process as she did not add her biceps injury until 180 days after her initial injury, "[d]espite being represented by counsel for nearly her entire workers' compensation claim." (*Id.*) Plaintiff also claims, as evidence of hostility, that her supervisor, Schmidt, "made negative assumptions" about Plaintiff's abilities when she was on leave, resulting in an "eagerness to replace [her]." (Response, Doc. 26, Pg. ID 1612-13.) But, again, TriHealth argues that Schmidt's assumptions about Plaintiff's ability to work in the ER were based upon Plaintiff's self-reported limitations on her accommodations form. (Reply, Doc. 29, Pg. ID 1894.)

Finally, Plaintiff argues that TriHealth's repeated delays and denials ultimately delayed Plaintiff's treatments, surgery, and return to work; this is evidenced by her "rapid rate of recovery" following her surgery. (Response, Doc. 26, Pg. ID 1613.) However, TriHealth notes that in July 2022, four months after her surgery, Plaintiff reported "more extensive restrictions than she did almost a year earlier." (Reply, Doc. 29, Pg. ID 1894.) This undercuts Plaintiff's theory that she improved "rapidly" from her surgery and could have returned to work sooner had TriHealth not delayed the surgery. (*Id.*)

The Court agrees with TriHealth and finds Plaintiff's arguments unavailing. First, Plaintiff is correct to note certain factors that courts can consider when finding retaliatory motive, such as hostile attitudes, but Plaintiff fails to note that "whether legitimate

36

reasons exist for the discharge" is one such factor as well. *Sharp*, 674 F. App'x at 445 (collecting cases). Indeed, as discussed extensively above, Plaintiff was terminated because she had exhausted her leave and could not perform the functions of her position with or without reasonable accommodation. And, her claims of TriHealth's "war of attrition" regarding her workers' compensation are similarly unconvincing. Schmidt determined that Plaintiff could not perform the job, not because Schmidt made unfair and unfounded assumptions about Plaintiff's abilities, but because Plaintiff herself reported that she could not lift above ten pounds and had limited mobility—essential functions of the role. (Molinaro Dep., Pg. ID 1033, 1036-38.) Moreover, many of the delays were due to Plaintiff's own inaction. As TriHealth notes, Plaintiff failed to include one of her injuries in her claim until half a year after it happened, even though it was previously revealed on an MRI. (Molinaro Dep., Doc. 22, Pg. ID 999, 1001.) Once she finally sought its inclusion on her claim, she had to wait for the approval of the biceps injury; this waiting period is why Plaintiff scheduled her surgery in April 2022 and not sooner. (*Id.*) Once again, the delay was caused by Plaintiff's own lack of expediency. Plaintiff cannot point to any claim Defendant failed to timely certify.

The only evidence Plaintiff can point to is the comment from Schmidt that Plaintiff was very negative and "gets upset about everything." (Workers' Compensation Claim Notes, Doc. 17-5.) But this one statement, not directed towards Plaintiff but rather included in her workers' compensation file, hardly makes the case that Schmidt was hostile toward Plaintiff. *See Reed v. LMN Dev., LLC*, No. 3:16-CV-2216, 2020 WL 1031534,

at *5 (N.D. Ohio Mar. 3, 2020) (finding no causal connection when the record included very little evidence of hostility directed at plaintiff).

All that remains for Plaintiff's claim of a causal connection is temporal proximity. As the Court determined, though, the time period between Plaintiff's first claim and her termination was a year; moreover, eighteen months passed between the claim and her non-selection for the new position. While the Sixth Circuit has made an exception for "extreme temporal proximity," the general rule provides that "temporal proximity alone does not show the required causal connection." *Gaskins v. Rock-Tenn Corp.*, 982 F. Supp. 2d 760, 769-70 (S.D. Ohio 2013) (quoting *Cunningham v. The Kroger Co.*, No. C-050990, 2006 WL 3230323, at *3 (Ohio Ct. App. Nov. 9, 2006)). And, a "one-year time gap does not create an inference of a causal connection" for a workers' compensation retaliation claim. *Peterson v. UH Reg'l Hospitals*, No. 1:15-CV-2670, 2017 WL 916421, at *5 (N.D. Ohio Mar. 7, 2017) (collecting cases). In fact, the Sixth Circuit has found that a span of four months was too long to create an inference of retaliatory motive. *Id.* Thus, the Court agrees that Plaintiff has failed to establish the third element of her workers' compensation claim. Without a prima facie case, TriHealth is entitled to summary judgment on this claim.

## CONCLUSION

Based on the foregoing reasons, the Court **ORDERS** the following:

1. Defendants' Motion for Summary Judgment (Doc. 25) is **GRANTED**;

2. Summary judgment is **ENTERED** in favor of Defendants on all of Plaintiff's claims; and

3. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND